[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this eminent domain proceeding the appeal alleges that on July 17, 1986, the defendant Commissioner of Transportation (Commissioner) filed his assessment of damages and benefits concerning the taking certain property in Waterford of the plaintiffs Angelo Hronis[1] and Leonida Nicolaou and that the Commissioner found that "the premises hereinafter described were CT Page 2870 necessary for the layout, alteration, extension, change of grade or improvement of the State highway commonly known as Route U.S. 1" and that he appraised the damages in the sum of $9,900.00. The premises "so taken" were described at some length in paragraph 2 of the plaintiff's appeal.[2] In his answer the Commissioner admits the foregoing allegations including the description of the land involved including the rights thereon all as described in his certificate of taking and as they are alleged to be in paragraph 2 of the plaintiffs' appeal. He, however, denies the plaintiff's allegation that they "are aggrieved by such assessment because the same is inadequate." In addition, he has not filed any special defense. As appears below this court finds the plaintiffs to be aggrieved in this partial taking.
Briefly, the subject property is 0.39 acre (more or less) and is commercial property on the southerly side of Route #1 also known as Boston Post Road in Waterford. This property is improved with wood frame building construction housing a pizza restaurant, a package store and a four room residential apartment.
The defendant Commissioner's independent real estate appraiser throughout has been Herbert H. Riess of Norwich. Riess submitted a written appraisal report signed by him on February 13, 1987 that, in his opinion, the taking of July 17, 1986 had resulted in damages of $22,500.00.
After some motion activity in the file, the Commissioner filed his "Motion in Limine" dated, October 25, 1988, over two years after this appeal was filed, in which he asked the court to rule "that all evidence concerning damages allegedly arising out of lost parking places along the frontage of [the plaintiff's] property on Route 1 be excluded."[3] The reason advanced for the request "[seeking] to exclude all evidence claiming damages for lost parking along Route 1 was said to be that the state action was proper under the police power of the State for which no compensation can be paid." This was the first time police power was injected in this case. This motion which is dated October 25, 1988 and its consequences, which have significance for this case, refers to a view by the court (House, J) on October 19, 1991 and a number of claimed "facts" arrived as the result of this view, no one of which alleged facts appear in the court's memorandum of decision on the Motion in limine which was filed on April 9, 1991.
By letter dated June 4, 1991, Ann Maynard,[4] an employee of the Department of Transportation wrote to their appraiser, Herbert Reiss and enclosed a copy of Chief Justice House's Memorandum of Decision on the state's motion in limine. Among CT Page 2871 other things, she said that she had "highlighted" the areas in both the value finding report and 2b point format report "that refer to severance due to loss in parking." Her letter asked that Reiss submit "a bid for revised pages which delete any refer [sic] to severance because of loss of parking" and closed by saying that "This is in accordance with the judicial decision [House, J.] enclosed." As a result of this Reiss submitted a written appraisal report signed by him on October 4, 1991, that in his opinion, the taking of July 17, 1986 had resulted in damages of $2,700.00
On May 2, 1991, the plaintiffs filed a motion to reargue the Motion in Limine alleging that the reason stated for granting it which was "`. . . because of the many continuances and inordinate delays in getting the case to trial and the subject property evaluated' had no validity on law and fact." The Commissioner filed his objection to the motion to reargue the Motion in Limine on May 13, 1991.
This case was referred to the undersigned on August 6, 1991 and a hearing was held on September 24, 1991 before the undersigned on both the plaintiff's motion to reargue and the Commissioner's objection thereto. At the hearing the plaintiffs inter alia claimed that the motion in limine was inappropriate in this case, that the decision on it foreclosed them as a matter of law from the opportunity of demonstrating to a court an element of damages to their property rights, that this exclusion could not be justified as the exercise of the state's police power on this specific eminent domain case. The plaintiffs also claimed that the taking as alleged and admitted in paragraph 2 of their appeal demonstrated that the Commissioner took the right to construct inter alia, the bituminous concrete lip curbing on the plaintiff's property and that the decision on the motion in limine did say that the motion should be granted "as the Case presently stands" which was claimed to be vague.
The Commissioner, on the other hand, claimed that the plaintiffs did not contend that the motion was inappropriate when filed, that paragraph 2 of the certificate of taking did not mean what the plaintiffs claimed it meant and that the taking map so demonstrated and that, in effect, plaintiffs were asking this court to overrule Chief Justice House's decision made after viewing the premises and after hearing counsel's claims.
In ruling on these two motions this court denied the Commissioner's motion to put on live evidence noting that there had been none offered at the earlier hearing. The Court also acknowledged the deference it felt to be accorded to the earlier decision (House, J.) See Carothers v. Capuzziello, 216 Conn. 82,107-111 (1982); Rosenblit v. Danaher, 206 Conn. 125, 132-135
CT Page 2872 (1988); Breen v. Phelps, 186 Conn. 86, 99 (1982). In doing so, however, this Court pointed out that it could not understand why the plaintiffs should not at least have the opportunity of offering the evidence of the excluded matter to the court who actually tried the case but which the earlier decision (House, J.) excluded as a matter of law. The language granting the earlier exclusionary motion "as to the case presently stands" also caused this court genuine concern and was not explained. The defendant Commissioner's motion to put on live evidence before this court on the motion to reargue and the objection apparently came about when his counsel opined that he felt constrained to do because this court believed that the decision on the motion in limine had not adequately articulated the reason for granting it. This court believed that such action completely foreclosing the plaintiffs was not appropriate, especially where the denial was, in effect, as a matter of law. Moreover, the plaintiffs cannot be seriously faulted for not seeking an articulation as the Commissioner implies because the decision of House, J. was not filed until April 9, 1991, and their motion to reopen was filed not long thereafter, i.e. May 13, 1991. More importantly, this court believed that under all the circumstances apparent to it that fairness and justice required that this court rule as it did here and that the plaintiff at least have the opportunity of offering the evidence excluded by the motion in limine. Finally, this court did not agree with that objection of the Commissioner to reargument about a number of facts alleged to have been found by House, J. as the result of his view of the premises. An examination of that court's memorandum does not, it is submitted, disclose any facts disclosed by that court's view.[5] Rather, the commissioner's brief on the motion in limine sets out what his counsel contends are facts resulting from the view of the subject property. "It is well settled that representations of counsel are not, legally speaking, `evidence.'" Cologne v. Westfarms Associates, 197 Conn. 141, 154 (1985) and cases there cited. They are, furthermore, not facts.
The trial of this appeal covered about five days. Ten witnesses testified. Some 77 exhibits were offered. After the trial, the court viewed the premises in the presence of counsel. The transcripts of the testimony covers over 1,100 pages. The parties have filed long post-trial briefs.[6]
Among other problems the trial generated serious questions of credibility. The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1, 14 (1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648 (1984); Steinman v. Maier, 179 Conn. 574, 576 (1988). It may also draw CT Page 2873 reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561 (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg,195 Conn. 253, 257 (1985); Gutowski v. New Britain, 165 Conn. 50, 56
(1979); Rood v. Russo, 161 Conn. 1, 3 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, Bieluch v. Bieluch, 199 Conn. 55, 555 (1986); Acheson v. White, 195 Conn. 211, 217 (1985), and, in "evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556.
"Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Grigley,177 Conn. 558, 563 (1979). The interest of any witness may also be considered on the issue of credibility. Buonanno v. Cameron,131 Conn. 513, 515 (1945): Nesbit v. Crosby, 74 Conn. 554, 564
(1902).
"It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 93 (1937). Judge Learned Hand once said: "It is true that the carriage, behavior, bearing, manner and appearance of a witness — in short, his demeanor' is a part of the evidence. The words used are by no means all that we rely on in making up over minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that [the trier of fact] is as little confined to them as we are. [The trier of fact] may, and indeed should, take into consideration the whole nexus of sense impressions which [the trier of fact] get from a witness." Dyer v. MacDougal, 201 F.2d 265, 268-269 (2d Cir. 1952). "The demeanor of witnesses is recognized as a highly useful, even if not an infallible, method of ascertaining the truth of their narratives." Oscar Gruss Son. v. Lumbermens Mutual Casualty Company, 41 F.R.D. 279, 282 (S.D.N.Y. 1966). It has been pointed out that where "testimony becomes completely irreconciliable . . . the court is obliged to make credibility decisions based on its observance of the witnesses and on its common sense impression of the reasonableness of the various versions of the event." State of Louisiana ex rel Gaste v. m/v Testbank, 564 F. Sup. 729, 734
(E.D.La. 1983); affirmed 767 F.2d 916, 917 (1985). Among the things that the trial court may consider in discharging its fact-finding function are "its observation of the demeanor and conduct of the witnesses and the parties." Lupien v. Lupien, 192 Conn. 443,445, 472 A.2d 18 (1984). Hotchkiss v. Barnhart, 2 Conn. App. 164,165, 476 A.2d 638 (1984). CT Page 2874
The plaintiffs, in their brief, set out the issues as follows: (1) whether the state took the plaintiffs' property pursuant to its power of eminent domain or pursuant to the police power, (2) whether the plaintiffs are entitled to consequential damages as a result of the defendant Commissioner's obtaining a variance pursuant to General Statutes 48-24; (3) whether the defendant Commissioner may introduce evidence that the (bituminous concrete) lip curbing as installed was not on the plaintiffs' property when the Commission took the right to install this curbing on the plaintiffs' property by its eminent domain power, (4) whether the court should consider the Commissioner's appraisals where the appraiser "performs the vast majority of his appraisals for the defendant (Commissioner)" and where that appraiser "performed multiple appraisals on the plaintiffs' property in an effort to satisfy the defendant's litigation needs"; (5) whether the plaintiffs are entitled to compensation for loss of access rights to Boston Post Road (U.S. Route #1) and (6) the amount[7] of compensable loss suffered.
The defendant Commissioner's brief, on the other hand, adopts a different format from that of the plaintiffs and does not set any generic declaration of specific issues. Upon examination of it, however, it appears fair to say that it puts into issue the plaintiffs' claims set out above and their exposition as set out in the plaintiffs' brief. In addition, the Commissioner attacks the appraisal report and testimony of the plaintiff's expert, Christopher Miner (Miner) not only in its conclusions but also in claimed errors, incorrect assumptions, inconsistencies and the like in both Miner's live testimony and his written appraisal report. The Commissioner claims that Miner's evidence that the compensation due the plaintiffs in the amount of $117,000.00 is grossly incorrect and that this court should rather find that the damages due them are not more than $2,700.00. He also contends that the plaintiffs have in effect changed their initial theory in this proceeding from one under General Statutes 13a-73f now to one under this condemnation proceeding to one under under General Statutes 13a-73b. Continuing, the Commissioner maintains that the bituminous lip curbing (lip curbing) was not only not installed on property of the plaintiffs but rather was installed on State property and that the evidence so shows. Moreover, he contends that the construction of this lip curbing is "a purest example of the use of the (State) police power." While repeating his claim that "the evidence shows that the lip curbing was not on property owned by Hronis but was on State property" he also says that "the portion of the lip curbing that was installed on Hronis property is a small curbed portion along Miner Lane." Going, on the Commissioner claims "However, the bituminous lip curbing along Miner Lane was separate and apart from the bituminous lip curbing along U.S. Route 1." He, therefore, concludes that "Accordingly, any damages attributed to the loss CT Page 2875 of parking in front of the Hronis premises, are not compensable in conjunction with the 223 square feet of land" admittedly actually taken by him.
At this point certain other facts are to be set out concerning this partial taking. Leo Nicolaou, one of the plaintiffs and Angelo Hronis, the other plaintiff's decedent, purchased the subject property in 1967. That property, which comprised about 0.39 more or less of an acre, was located at the intersection of U.S. Route 1 (Boston Post Road) and Miner Road. It was bounded northerly by Route 1 and westerly by Miner Road. It had about 100 feet frontage on Route 1. The property was improved with wooden framed construction which consisted of a package store, pizza restaurant and one apartment.
The land and the wooden building existed prior to zoning in Waterford and so both were non-conforming when zoning was later adopted (after the purchase by Nicolaou and Hronis). When the plaintiffs purchased the property in 1967, there was a package store there at that time. Among other aspects of the property, the pre-zoning parking arrangement in front of the building became non-conforming with zoning. This non-conforming parking was for about ten to twelve parking spaces. This non-conformity, according to David Martin, Waterford's zoning enforcement officer, was nonconforming as to the number of parking spaces for the property, nonconforming "in terms of access to the property", nonconforming as to the "buffers on the site", nonconforming as "to access drives and widths, that sort of thing."
The plaintiffs' property was and is located in a general commercial (C-G) district and is in a prima commercial area as of the town of Waterford. This property is level at the grade along Route 1 but along Miner Lane it inclines to a lower level behind the wooden construction on the property.
Prior to the taking, the Commissioner, acting pursuant to General Statutes 48-24[8] applied to the Waterford Zoning Board of Appeals for a variance seeking an approval of a reduction in the minimum lot size then required under the zoning regulations. The hardship claimed by him was that the "failure to grant could cause the total acquisition of the property." See General Statutes 48-24. The requested variance was granted in December 1985.
On July 17, 1986, the Commissioner took the following premises on the Southerly side of "Present Route U.S. 1 bounded:
"Northerly — by Present Route U.S. 1, 88 feet;
Easterly — Running to a point; CT Page 2876
Southerly — by Owner's remaining land, 89 feet, more or less, by a line designated" Taking Line, as shown on the map hereinafter referred to:
Westerly — by land now on formerly of Joshua Goldberg, et al. 5 feet, more or less.
And said parcel contains 0.01 of an acre, more or less, together with all appurtenances, all of which more particularly appears on a map entitled; "Town of Waterford, Map Showing Lane Acquired from Angelo Hronis et al by the State of Connecticut, Improvements on U.S. 1, Scale 1"=40', August 1984, Robert W. Gubala, Transportation Chief Engineer — Bureau of Highways." (152-106-17).
Said premises are taken together with the following rights "upon portions of Owners' remaining land:"
2. The right to install proposed bituminous concrete lip curbing, within an area located between and opposite approximate Stations 117+90 right and 118+33 right, Base Line Route U.S. 1, as shown on said map. . . ." (Emphasis added) Other rights upon portions of the owners' remaining land, covering a total area 0.02 acres, more or less were also taken. The taking map, in evidence as Exhibit A and dated August 1984, was used by the Commissioner for his taking in 1986. As a result of the 1986 taking the highway line of U.S. Route 1, along its course from east to west, was brought closer to the wooden building on the plaintiffs' property. According to Oliver Paquette, the defendant's "Chief of Surveys", as the southerly bound of the piece taken moved westerly from the easterly extremity along its length of 89 feet, more or less, the highway line came closer to this building from zero inches to as much as five feet. This five foot dimension referred to by Paquette was in the immediate area of what one visualizes as the ingress and egress to and from U.S. Route 1 upon which there was no bituminous lip curbing.
On March 15, 1988, the plaintiffs applied to Waterford Zoning Board of Appeals requesting it to vary certain zoning regulations referred to in that application in order to allow them inter alia access to their property from Boston Post Road. They claimed hardship because the State had acquired certain property rights [of theirs], which ". . . resulted in a loss of parking and access to [their property]." The Board granted certain variances requested in this application and denied others. Specifically, it refused to vary 20.8c, 20.8a and 20.8q of their regulations. Section 20.8 of the regulations of which (a), (c) and (g) are such a part is entitled "Access Drives and Vehicular Circulation." The reason given for the Board's action was "Denial of Boston CT Page 2877 Post Road access variances because of public safety concerns."
The plaintiffs first turn to the issue of whether the state took their property pursuant to the power of eminent domain or pursuant to its police power. They maintain that the taking, which included not only the triangular piece (approximately 89 feet on each side and approximately 5 feet at its base) actually taken on the westerly portion of their boundary on Route U.S. #1, but also those rights "upon portions of Owner's remaining land" were all taken pursuant to the state's power of eminent domain. There they point to General Statute 13a-73(b) and that its provisions were followed by the Commissioner throughout resulting in his 1986 determination that the resulting damages were in the sum of $9,900.00.
Turning to their appeal from this assessment of damages to the Superior Court which encompassed three paragraphs, they point out that the first paragraph alleges that the Commissioner filed with the Clerk of the Superior Court his assessment of the benefits and damages made by him under the statutes with reference to their property necessary for the layout, widening, etc. of Route #1 in which he appraised their damages to be $9,900.00. This paragraph, they note, is admitted in the Commissioner's answer. The second paragraph alleges "the premises so taken" are as therein set and includes not only the triangular piece, measuring approximately 89 feet by 5 feet but also that "Said premises are taken together with the following rights upon portions of Owner's remaining land. . . ." There then follows the detailed description of four rights including ". . . 2. The right to install proposed bituminous concrete lip curbing, within an area located between and opposite approximate Stations 117+80 right and 118+33 right, Base Line Route U.S. 1, as shown on said map, . . ." This second paragraph was also admitted in the Commissioner's answer. The third paragraph which alleges that the plaintiffs are aggrieved by the damages assessed is, however, denied by the Commissioner. No special defense has been filed by the Commissioner.
The plaintiffs position is that their property as well as the rights therein set out were taken by the Commissioner pursuant to eminent domain and that he cannot thereafter claim otherwise by advancing the police power argument. Underlining this position they refer to several matters. First, they maintain that the Commissioner's admissions in the pleadings are binding upon him as judicial admissions and that he cannot now change his position and cannot now offer evidence that the much-contested bituminous lip curbing is not on their property but on state property. Second, citing a Kansas case, i.e. Smith v. State Highway Commission, 346 P.2d 259 (1959) they contend that upon docketing, the Commissioner's Notice of Condemnation and Assessment of CT Page 2878 Damages, became the "jurisdictional instrument" upon which the trial was to be conducted," i.e. as an eminent domain proceeding. Third, they argue that even according to evidence adduced by the Commissioner, particularly Oliver Paquette and Thomas Wagner, this taking, which was to widen Route #1, was pursuant to the eminent domain power. Moreover, they assert that the Commissioner produced no witness to support their police power argument.
On the other hand, the Commissioner claims that despite his admissions in the pleadings, such admission does not mean that the lip curbing had to be constructed on the plaintiffs' property although he certainly had the right to do so. He does concede that a small portion of the lip curbing in the area of Miner Lane and the extreme easterly end of the plaintiffs' boundary on Route 1 — and this court so finds. That, however, is "separate and apart" and has nothing to do, he says, with the lip curbing to the west along Route 1 in front of the package store and the pizza parlor where the plaintiffs claim the lip curbing is located that prevents access. This is so, he claims, because the lip curbing, which is installed there, unlike that to east at Miner Lane and Route 1, has not been installed on the plaintiffs' property but on state property. Being so installed on state property, as he claims, for the purpose of safety, the Commissioner says, is "a purest example of the use of the police power." This contested lip curbing, we should point, is eight or nine inches wide, according to Paquette. Therefore, any damages attributed to the loss of parking in front of the plaintiffs' premises is not compensable, the Commissioner argues, in conjunction with his taking of the triangular piece along Route 1 which comprises about 223 square feet.
At this point it is important to endeavor to determine on the credible evidence where this lip curbing is situated. This is so because the effect of this physical installation has been to prevent that parking and access formerly enjoyed by the plaintiffs particularly in front of the package store and pizza parlor as well as access to Route 1. The lip curbing involved here does not extend westerly along Route 1 to the very terminus of the plaintiffs' boundary on Route 1. It does, however, extend westerly along the greater part of that boundary but its westerly terminus is such so as to leave a cut or uncurbed space that permits vehicular some ingress and egress from Route 1 to the front of the plaintiffs' package store and pizza parlor. This access, however, to and from Route 1 can no longer be legally used as a result the state's actions concerning this property in the widening of Route 1 which have extinguished its nonconforming character including its nonconformity as to parking.
The police power may be distinguished from the power of CT Page 2879 eminent domain as follows: "Eminent domain takes property because it is useful to the public. The police power regulates the use of property or impairs the rights in property, because the free exercise of these rights is detrimental to public interest." Windsor v. Whitney, 95 Conn. 357, 367, 111 A. 354. All private property is held subject to the right of the government to limit its use through the exercise of the police power: State v. Hillman, 110 Conn. 92, 105, 147 A. 294; and the owner is not entitled to compensation for the diminution in value of his property resulting from restrictions placed upon its use by a valid exercise of the police power. Goldblatt v. Hempstead,369 U.S. 590, 593, 82 S.Ct. 987, 8 L.Ed.2d 130; Mugler v. Kansas,123 U.S. 623, 668-69, 8 S.Ct. 273, 31 L.Ed. 205. The police power may even comprehend the destruction or removal, without compensation to the owner, of property which is of little value and poses a threat to the health, safety or welfare of the public. Gardner v. Michigan, 199 U.S. 325, 26 S.Ct. 106,50 L.Ed. 212; State v. Main, 69 Conn. 123, 137, 37 A. 80; see 39 Am.Jur.2d, Health, 33." DeMello v. Plainville, 170 Conn. 675, 679
(1976).
It must also be remembered that "the fact that the exercise of the police power prevents the enjoyment of certain individual rights in property without providing compensation therefor does not necessarily constitute a taking of the property without just compensation." Ridge Estates Inc. v. Planing Commission,160 Conn. 109, 117 (1970).
There can, thus, be no serious question that the state may regulate the use or impair private property in the proper exercise of its police power and may even do so without compensation to the owner. In this case, however, the state instituted an eminent domain proceeding. In doing so, it took, the right, inter alia, to install this lip curbing "upon portions of the Owner's remaining land" (emphasis added) and the pleadings admit that this right was so taken. This a judicial admission. See e.g. West Haven Sound Development Corporation v. West Haven,201 Conn. 305, 312 (1986). This admission stayed in the case and no motion has ever been made to amend that portion of the Commissioner's answer. See Dreier v. Upjohn Co., 196 Conn. 242,248 (1985). Damages sustained in a taking by eminent domain have been said to be measured as of the date of the taking and the statutory date for property taken by the state for highway purposes is the date on which the assessment is filed with the clerk of the Superior Court. Slavitt v. Ives, 163 Conn. 198, 206
(1972); Research Associates Inc. v. New Haven Redevelopment Agency, 152 Conn. 137, 139 (1964); Colaluca v. Ives, 150 Conn. 521,531 (1963). It is quite fair to assume that the Commissioner included in his assessment of the damages what he felt in dollars the plaintiffs were entitled to as just CT Page 2880 compensation for the right to "construct" this lip curbing "upon portions of [plaintiff] remaining land." (Emphasis added) Moreover, this right was not designated as one temporary in nature. The taking map, which was Exhibit A, was a Class D map which is that type of map which the Commissioner normally used for takings. An examination of it could fairly lead to the conclusion that that marking by the Commissioner on it as the course of the lip curbing right taken was, at least in part, upon the plaintiffs' remaining property as depicted on that map. A taking map should, as to what is taken, show the boundaries, other necessary descriptive matter and the quantity of land taken so exactly as to be understood by an ordinary person who is not a surveyor. See 29A C.J.S. Eminent Domain, 226, pp. 1020-1021.
At the trial, the court admitted, over objection, and through the Commissioner's witness Paquette, a map, dated October 1991, made by the Commissioner entitled "map showing Highway Line and Topography adjacent to Land of Angelo Hronis et al" which became Exhibit 34. The occasion for Exhibit 34 came about "a couple of months ago" (before the trial that Paquette had told counsel for the Commissioner that a portion of the bituminous lip curbing "may be on the Hronis property"). Actually, at trial, and after Exhibit 34 was admitted, Paquette said that a portion of the lip curbing was on the parcel of land taken from Hronis. Exhibit 34, unlike the taking map, was a Class A2 map which was said to be more accurate[9] than a Class D map which was the taking map here and which (Class D) map "is basically used for our takings." Exhibit 34 is not a reproduction of Exhibit A but purports to show the relationship of the installed bituminous lip curbing and the highway line of Route 1 a lot more accurately than the taking map. Going on, Paquette maintained that it more clearly depicted the relationship of the curbing to the highway line. Paquette, who testified concerning both Exhibit A and Exhibit 34 said that a Mr. Schessler, under Paquette's supervision, "performed" Exhibit 34. The survey work for the taking map itself, i.e. Exhibit A was done under the supervision of a Mr. Gernhardt who was a licensed surveyor and civil engineer. Neither Schessler or Gernhardt testified at the trial.
Exhibit 34, in depicting the lip curbing with its relationship to the highway line shows the lip curbing in issue[10]
along its course depicts it to be any where from 0.64' to 2.32' northerly of what the Commissioner contends is the taking line along Route 1. This court has great difficulty in crediting the Commissioner's claims for Exhibit 34 under the circumstances including that its preparation only recently for the purposes of this litigation. In that regard we point out that the issue of where the lip curbing was, i.e. on the plaintiffs' property or on state property has been in this case since at least 1988 when the Commissioner's counsel brought it in CT Page 2881 with the motion in limine. To be sure, we recognize that the Commissioners counsel said early in 1990 that the lip curbing ". . . was constructed on the State property as part of the police power. . . ." "Representations of counsel are not `evidence' and certainly not `proof.'" Cologne v. West Farms Associates,197 Conn. 141, 153 (1985). We point out again that even Paquette, after Exhibit 34 had been made, said that a portion of it was on the plaintiffs' property. Given the Commissioner's claim that this lip curbing is on State property, one wonders why there has been no reasonable explanation for allegedly installing it there after that right to do so was specifically stated to be taken upon other remaining land of the plaintiffs. See generally Munson v. MacDonald, Highway Commissioner, 113 Conn. 651, 656
(1931). Counsel for the Commissioner said that just because the Commissioner had taken the right to install the lip curbing on plaintiffs' property does not mean that it was in fact so installed. While where all or part of this actual installation is a close question, there is respectable authority to the effect that the damages required to be paid by a condemnor to the owner must be for the property and rights therein taken by him even though the condemnor may not actually use everything condemned. See Danish Vennerforving Toid P.H. v. State Department of Roads, 217 N.W.2d 819, 822 (NEB. 1974); City of Corpus Chrisiti, 404 S. .3d 826, 832 (Tex. 1966). See also Henderson v. Iowa State Highway Commission, 151 N.W.2d 473, 476
(Iowa 1967). Curiously, the Commissioner makes no claim, that having taken this right to install the lip curbing "upon" the plaintiffs he abandoned or relinquished it.
In the matter of the lip curbing on the Route 1 bound of the plaintiffs' property, we note that Exhibit 34, which was testified to be more accurate than the actual taking map, does not actually indicate whether this curbing was "between and opposite" the numbered stations as shown on the actual taking map in Exhibit A. The claim that Exhibit 34 may only be a partial map for purposes of this litigation is quite true, but its partiality goes to making the evidence incomplete certainly insofar as anchoring the course of this lip curbing vis a vis the actual property line on Route 1. In that connection reference is made to the term "base line" by the Commissioner, yet that term was not credibly, if ever, defined in the evidence. In addition, the widest point in the triangular sliver of land actually taken is what is essentially the base of that triangle and that dimension is "5 feet more or less" at the extreme westerly edge of the plaintiffs' property. As that triangular sliver is followed easterly along its approximately 89 foot course it progressively becomes more narrow and eventually comes to a point which means that the dividing line between state property and the remaining land of the plaintiffs becomes much closer on the ground itself. CT Page 2882
Given the taking map, the shortcomings of Exhibit 34, the testimony of Paquette, the Commissioner's admission of paragraph 2 of the plaintiffs appeal, and other evidence the court finds that the lip curbing has been installed, at least in part, "upon portions of owner's remaining land." (Emphasis added) This Court, does say that, based on the evidence already set out, that the Bituminous lip curbing has been installed, at least in part, upon a portion of the plaintiffs' remaining land. It is, therefore, concluded that this was done not by an exercise of the police power but by the right of eminent domain. The significance of this conclusion on the issue of damages is taken up below on the discussion of damages.
"Under our constitution, no property shall be taken for a public use without just compensation. Conn. Const., Art. 1 11. This has been interpreted to mean that the condemnee is entitled to receive a fair equivalent in money for the property taken, as nearly as its nature will permit. Schnier v. Commissioner of Transportation, 172 Conn. 427, 431, 374 A.2d 1087 (1977); Colaluca v. Ives, 150 Conn. 521, 530, 191 A.2d 340 (1963). The measure of damages is ordinarily the fair market value of the acquired land on the day of taking. Ibid. Where only a part of a tract of land is taken for the public use, the award will include the value of the part taken as well as any damages visited upon the remainder as a result of the taking. D'Addario v. Commissioner of Transportation, 172 Conn. 182, 184,374 A.2d 163 (1976). In Lefebvre v. Cox, 129 Conn. 262, 265, 28 A.2d 5
(1942), we stated: "The ordinary rule for measuring damages where a portion of a tract of land is taken is to determine the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value." (Emphasis added). See Andrews v. Cox, 127 Conn. 455,17 A.2d 507 (1941). In determining the market value of the remainder after a partial taking we have said that "it is proper for the trier to consider all elements which are a natural and proximate result of the taking and which could legitimately affect the price a prospective purchaser would pay for the land." Bowen v. Ives, 171 Conn. 231, 236, 238 A.2d 82 (1976). Because fair market value has been defined simply to mean that price that a willing seller and a willing buyer would agree upon following fair negotiations; see Lynch v. West Hartford, 167 Conn. 67, 73,355 A.2d 42 (1974); Uniform Eminent Domain Code 1004(a); 27 Am.Jur.2d, Eminent Domain 267, an appraisal of fair market value should take into consideration that use of the property that would provide a prudent investor the greatest financial return. Connecticut Printers, Inc. v. Redevelopment Agency, 159 Conn. 407, CT Page 2883 411, 270 A.2d 549 (1970); 4 Nichols, Eminent Domain (3d Ed.) 12.314." Tandet v. Urban Redevelopment Commission, 179 Conn. 293,298-99 (1979).
We turn now to the matter of whether the plaintiffs are entitled to consequential damages as a result of the Commissioner's obtaining a variance pursuant to General Statutes48-24. That statute requires that a condemnor, in the event of a partial taking, "shall" if the remaining portion does not conform to zoning, obtain a variance for the remaining property before condemning any such property." It further provides that if a condemnor does not obtain a variance "prior to the taking", then the property owner[s] shall be reimbursed for the total amount of the property and the condemnor shall take fee simple title to the entire property. This raises the matter of damages to which the plaintiffs maintain they are entitled. "Our law provides for recovery for severance damages where there is a condemnation of a portion of a parcel of lend and the remaining land is not taken either by condemnation or in a constitutional sense. The proper measure of damages is the difference between the market value of the whole parcel as it was before the taking and the market value of what remains thereafter. Gontarz v. Berlin, 154 Conn. 695, 697, 229 A.2d 29; Eljay Realty Co. v. Argraves, 149 Conn. 203, 205, 177 A.2d 677; Northeastern Gas Transmission Co. v. Ehrhorn, 145 Conn. 83, 86, 139 A.2d 53." Laurel Inc. v. State, 169 Conn. 195, 205 (1975). Although a variance was granted[11] over the plaintiffs objection for the minimum lot area requirements upon the Commissioner's application to the Waterford Zoning Board of Appeals, that action instituted by the Commissioner effectively resulted in extinguishing the nonconformity the plaintiffs had possessed for years as to their property which nonconformity had existed in several respects including parking and access from Route 1. This loss, in turn, required the plaintiffs, as owners, to go to the Planning and Zoning Commission to seek to obtain site plan approval for new parking arrangements on the premises. We are mindful that it has often been said that the question of what is just compensation is an equitable one rather than a strictly legal or technical one. See e.g. Slavitt v. Ives, 163 Conn. 198, 209 (1972); Ives v. Addison, 155 Conn. 335, 341 (1967). Therefore, although the 48-24
recourse available to the Commissioner must be availed of by him "prior to the taking" it appears consonant with the constitutional guaranty of just compensation, that where an 48-24
application results in a variance being granted such granting is a factor affecting market value that the court could consider. For support of that position this Court here looks to the opinion of our Supreme Court in Smith v. Zoning Board of Appeals,134 Conn. 323 (1978). In Smith, a partial taking case, the Court had to deal with a condemnee's claim that granting the Commissioner a variance under 48-24 without their consent violated their CT Page 2884 constitutional right to just compensation by forcing them to assume the financial risk of structural alteration or sale of property subject to a variance. The Supreme Court disagreed with this claim. In doing so it said "The plaintiffs' claims for consequential damages to the remaining land resulting from the partial taking could be considered by a trier of fact under General Statutes 13a-76. Damages would be calculated by subtracting the market value of the remainder after the taking from the market value of the property just prior to the taking. [citations omitted]. The state referee could properly consider the variance as a factor affecting the market value of the plaintiffs' remaining land. [citations omitted]." Smith v. Zoning Board of Appeals, supra. 328-329. It, therefore, seems proper to consider the variance granted the Commissioner as such a factor in this case and this court will do so.
The plaintiffs also claim that they are entitled to compensation "for loss of access rights to Boston Post Road (Route 1)." We note as to this issue that "loss of access" was before our Supreme Court in the case of Wakeman v. Commissioner,177 Conn. 432 (1979). In Wakeman, the court said:
"Both sides offered evidence on "cost to cure" or the cost of adapting the remaining land to the existing nursery business due not only to the loss of parking and display area, but more importantly, due to the loss of access. Any expense which is reasonably necessary to adapt the remaining land to use in view of changes to be made in the land taken may properly enter into the damages to be awarded. Andrews v. Cox, 127 Conn. 455, 459-60,17 A.2d 507 (1941). "The certainty or probability of future expenditures on the property rendered necessary or desirable by the changed conditions resulting from the completion of the public improvement, may affect the present value of the property after the improvement is completed, but they affect it only indirectly and are not in themselves recoverable items of damage." Gaylord v. Bridgeport, 90 Conn. 235, 240, 96 A. 936
(1916). As stated in Andrews v. Cox, supra, 460, "[t]he more accurate statement is, however, that such expenses are not recoverable as such but are evidence of elements in the decrease in market value, of which they may be an accurate measure." See also 27 Am.Jur.2d, Eminent Domain 314. Cost to cure is an element to be considered in reaching a valuation only when it is no greater in amount than the decrease in the market value of the premises if left as they stood. 4A Nichols, Eminent Domain (3d Ed.) 14.22. If the cost to cure does restore the property to its former relative position, then the condemnee is not entitled to the cost of restoration in addition to an award for the difference in the before or after value, 5 Nichols, Eminent Domain (ed Ed.) 23.2." CT Page 2885
In another Connecticut case involving denial of access the court said:
"When only a part of a tract of land is taken for the public use, `just compensation' includes recovery for the part taken and recovery for any damages visited upon the remainder which result from the taking. . . . The use to be made of the land taken is to be considered with regard to its effect on the remaining land, and the fact that injuries are caused by the construction activities of the contractor is not a bar to recovery so long as the damages foreseeably follow such construction activities and are a necessary natural and proximate result of the taking D'Addario I, supra, 184-185. See Bowen v. Ives, 171 Conn. 231,238, 368 A.2d 82 (1976); Meriden v. Highway Commissioner,169 Conn. 655, 659, 363 A.2d 1094 (1975); Budney v. Ives, 156 Conn. 83,88, 239 A.2d 482 (1968); Lefebvre v. Cox, 129 Conn. 262, 265,28 A.2d 5 (1942); Andrews v. Cox, 127 Conn. 455, 458-59,17 A.2d 507 (1941); all cited in D'Addario I; Wakeman v. Commissioner of Transportation, 177 Conn. 432, 435, 418 A.2d 78 (1979); 4a Nichols, Eminent Domain (3d Ed.) 14.24, 14.243 and 14.2431." D'Addario v. Commissioner of Transportation, 180 Conn. 355, 368
(1980) quoting in part from D'Addario v. Commissioner of Transportation, 172 Conn. 182, 184-185 (1976). In a recent case discussing severance damages concerning land taken for a highway easement, the court reiterated that the land owner "is entitled to compensation for such damages as well as the damages immediately following from the [in that case] contemplated highway improvement project for which the land was taken and that it is proper "to consider such use of the land taken as would in any reasonable anticipation be most advantageous to the landowner." Alemany v. Commissioner of Transportation, 215 Conn. 437,445 (1990). The destruction of a right to access to a parcel of land has been said to constitute the taking of it in the constitutional sense. Stock v. Cox, 125 Conn. 405, 419
(1939); Laurel Inc. v. State, 169 Conn. 195, 201 (1975).
On the matter of compensation for loss of access it has been said that "The condemnor must leave an owner of land abutting a street with reasonable access to the highway for his purposes where he had access immediately prior to the condemnation. However, an abutting owner is not entitled to damages under theFifth Amendment to the [United States] Constitution for the taking or closing off of access to a highway where reasonably suitable means of access remains....What constitutes reasonable access presents a question of fact." United States v. Certain Land in the State of New Jersey. 439 F.2d 670, 673
(3d Cir. 1973); see also Commonwealth Department of Highways v. Rosen Hatt 416 S.W.2d 754, 757 (1967); 26 Am.Jr.2d, Eminent Domain, 203; 27 Am.Jur.2d Eminent Domain, 311. Damages resulting merely from circuity of access have been considered damnum obsque CT Page 2886 injuria. Selig v. State of New York, 10 N.Y.2d 34, 39 (1961). Stated another way, inconvenience is not the "dispositive damage yardstick," Raj v. State of New York, 507 N.Y.S.2d 770, 771 (1986).
Before discussing and assessing the evidence as to the nature and character of the remaining access by way of Miner Road some consideration should be given to whether it is merely circuitous (or inconvenient) or is unsuitable. "Suitable access now is any access by which entrance may be had to a property without difficulty." Slepian v. New York, 264 N.Y.S.2d 826, 829 (1965). It has also been said that the matter of suitability is a factual question directly related to the highest and best use of the property. Priestly v. New York, 23 N.Y.2d 152, 156 (1968); Falls Riverway Realty v. City of Niagara Falls, 732 F.2d 38, 42
(2d Cir. 1984) and, thus, it may be considered on the issue of fair market value including what a potential buyer might consider concerning the property. See e.g. State ex rel Department of Highway v. Linnceke, 468 P.2d 8, 11 (Nev. 1970).
"Such formulations, however, do not provide any definite or certain guides to the decision of particular cases. In light of this, the very definition of the concepts involved can provide a basis upon which to approach such determinations. "Circuitous," in its commonly accepted understanding, indicates that which is round-about and indirect but which nevertheless leads to the same destination. "Suitable," in its commonly accepted understanding, describes that which is adequate to the requirements of or answers the needs of a particular object. The concepts are not mutually exclusive and, therefore, a finding that a means of access is indeed circuitous does not eliminate the possibility that that same means to access might also be unsuitable in that it is inadequate to the access needs inherent in the highest and best use of the property involved." Priestly v. New York, supra.
The access left to the plaintiffs by way of Miner Road after the loss of access to Route 1 to the commercial uses of the package store and the pizza parlor resulted in their having to look to Miner Road for access which was clearly circuitous as compared to the Route 1 access. True, the Miner Road access was not a great distance away, but given the commercial character of the plaintiffs' two stores on Route 1 in a prime location with hitherto easy access. The Miner Road access was more than inconvenient and/or circuitous though it did lead to the same destination. But being forced to use Miner Road, a side road, was more disadvantageous to the plaintiffs use of their property than that. It was "unsuitable" access that was superimposed on "circuitous" access. One cannot consider suitability in the abstract. The plaintiffs needed access that was adequate to the maintenance and furtherance of the commercial use particularly on CT Page 2887 Route 1 where commercial uses abound. The credible expert testimony speaks to the highest and best use in the "after" as being essentially a commercial and retail (but leaving the apartment as is) according to Miner, the plaintiff's expert. The defendant's expert indicated that the highest and best use on the "after" would be the same as in the "before".) It would, however, appear to Reiss that in order to do this, the plaintiffs, because of the loss of access, to Route 1, would have to incur certain expenses to prepare the site in the rear of their property to comply with zoning. It is submitted that the expense of doing so is a factor which a prudent buyer would consider if interested in purchasing. The evidence, conflicting as it is, of the expenses for such site preparation, are, and will be considered on the matter of damages resulting from such unsuitable access.
With this background to which we will add as occasion requires, we come now to the matter of compensable losses or severance damages proximately resulting from this partial taking. This involves all the evidence including that of the experts. The plaintiffs' expert appraiser was Christopher Miner and the defendants' expert was Herbert Reiss. Both appraisers used the capitalization of income approach. Miner's opinion was that "the estimated market value of the property, as of the date of taking, but as the property existed before the take, was $217,000, and $100,000. as the property existed after the take, as if all project improvements were completed," thus making, in his opinion, for compensable damages of $117,000. Reiss, on the other hand, made four appraisal reports. The first was a "value finding appraisal",[12] made in September 1985 before the take of July 1986 and it estimated damages at $9,900. The second was also a "value finding appraisal", also made in September 1985 and it estimated damages at $3,900. The third, made in February 1987, estimated damages at $22,500. The fourth appraisal, which was made in October 1991 and after Reiss had received the Ann Maynard letter referred to earlier, estimated damages at $2,700.
The plaintiffs' argue that all of Reiss' appraisals are flawed for a number of reasons and that this court should consider only the appraisal made by Miner. Among the reasons advanced by the plaintiffs for doing so are that Reiss said that he performed the vast majority of his appraisals in such matters for the Commissioner, that he "altered" his evaluation of compensable loss based on information given him by the Commissioner, that he said two of them "were prepared based on information the Defendant supplied him", that he said that his appraisals did not represent his evaluation of compensable loss, that he assumed a certain variance would be granted as to their property (and it was not) and that although he said the income approach he used required the use of comparable rents he did not CT Page 2888 use such rents. The defendant claims that Reiss' appraisals should be seriously considered because his change of opinion downward as to damages was the legitimate result of the Referee's (House, J.) decision that no damages could be attributed any loss of parking in front of the plaintiffs' building.
The fact that Reiss did perform the vast majority of his appraisals goes to bias and to weight. Whatever inference, may be suggested, if any, to the term "altered" is largely irrelevant. Moreover, any improper connotation suggested by the term "altered" is rejected. The fact is, as already pointed, that Reiss did change his estimate after he received the Maynard letter containing a copy of Justice House's decision on the motion in limine. The Maynard letter did ask him, in the light of that decision, to submit a value opinion deleting any reference to severance (damages) because of loss of parking. He did, testify that his subsequent opinion of $2,700. was in accordance with the court decision Maynard sent him. It was apparent to the court both from observing Reiss and hearing his testimony that his independent evaluation of damages was contained in his July 1987 appraisal of $22,500 and not the later ones in which he he did not include severance damages because of loss of parking. Reiss' February 1987 opinion included severance damages because of the loss of parking. It is not fair, on the credible evidence, to say that Reiss said that two of his appraisals were "based" on information the defendant gave him thereby suggesting something improper. Rather, following the direction in the Maynard letter that Justice House's decision was to the effect that no damages could be allocated to loss of parking, Reiss followed that. Moreover, Reiss did use comparative rentals arriving at his opinions. While there are inconsistencies in his appraisals, these go to weight and credibility. The Court will not just only consider the Miner appraisal as the plaintiff urges. As will be discussed Miner's live testimony and written appraisal was not at without serious flaws going to his ultimate opinion of "compensation due" of $117,000.
As noted, both Miner and Reiss used the capitalization of net income as their method of estimating value. This method is one of the recognized methods of estimating the value of income-producing real estate. See e.g. Stanley Works v. New Britain Redevelopment Agency,155 Conn. 86, 98 (1967). After probable net income i.e. net operating income has been determined, that figure is capitalized by dividing that net income by what is opined to be the capitalization rate. The particular capitalization rate used in a given case is a judgment call by the particular expert based on his expertise. That rate, of course, is not constant, but depends upon a number of factors as the expert evidence disclosed. Miner used an overall capitalization rate of .1084 and Reiss used .1000. The net operating income is CT Page 2889 divided by the capitalization rate to yield a value (which Miner designated as "As — if Completed Value"). Miner, in turn, deducted from this value in his "before" taking evaluation the sum of $8200 which was the estimated cost of repairing the termite damage to the plaintiffs' building. Miner was "assisted" in reaching this estimate as well as his estimate of redevelopment site to comply with zoning by one Harry Mantsaris who owned a commercial and residential remodelling company. Mantsaris did not testify in this case but the court recognizes that cost estimates, that contain hearsay, can be based on data obtained from others. See Schaefer Jr. Co. v. Ely, 84 Conn. 501, 508 (1911); Tait, Handbook of Connecticut Evidence, 7.16.8(c). Deducting this $8200. figure from the "As — if completed value" of $225,185, the difference was $216,985 which he rounded to $217,000.
In arriving at this "before" value Miner used $9.00 per square foot for the package store, $13.00 per square foot for the pizza parlor and $475 per month rent for the apartment. In his "after" taking analysis, despite his inconsistent position on whether his estimate was largely based on loss of parking in the front, of the plaintiffs' property, the court finds that it was so based. In the "after", he used $6.00 per square foot for the package store, $8.00 per square foot for the pizza parlor and $435. per month for the apartment. It was Miner's opinion that the highest and best use of the plaintiffs' property before the taking was its then program of utilization. It was his opinion that in the after condition "the highest and best use of the property is to repair the termite damage, construct a parking lot in the back, a walkway to the front, and provide drainage, all as outlined in the section of his written report entitled on site description and because of zoning requirements, abandon the pizza restaurant and replace it with a retail use, and continue the use of a property for an apartment, a small and a large retail store."
The fair market value in such cases as these should be based on the highest and best possible use of the land giving a prudent investor the greatest financial return. See D'Addario v. Commissioner of Transportation, 180 Conn. 355, 365 (1980) and cases that cited.
Reiss, in his pre-Maynard February 1987[13] appraisal, in the "before" used $10.00 per square foot for the package store, $7.00 per square foot for the pizza parlor and $500. per month rental for the apartment. Applying the 10% capitalization which rate he felt was to be used to the net income he arrived at, Reiss' opinion of the "before" value was $173,690 rounded to $173,700. In the "after" he used $9.00 per square foot for the package store, $6.00 per square foot for the pizza parlor and $475. per month rental for the apartment. As to the "after", Reiss CT Page 2890 computed the value to be $151,230 which he rounded to $151,200. which, subtracted from $173,700. yielded his opinion of $22,500. It was Reiss' view in the "before" condition that the highest and best use was its existing use as a commercial property income for the owner. In the "after" condition, he considered the highest and best use to be the same as before but to that statement he added "however, there will be some restrictions due to the loss of the entrance to garage (of the apartment) and construction of lip curbing along Route 1."
In his "before" analysis, Miner assigns a value of $13.00 per square foot to the pizza parlor and $9.00 per square foot to the package store. He also uses the figure of $475. for the monthly rental of the residential apartment on the property in the "before". In the "after" he assigns a value of $8.00 per square foot for the pizza parlor and $6.00 per square foot for the package store. As to the residential apartment on the property he uses the figure of $435. per month. The plaintiffs' expert's evidence included certain rental data "was used as an aid to estimating the market rental value of the appraisal property." In that regard Miner's report set out ten properties that he used as comparables in his rental value analysis.[14] It is submitted, and neither counsel has submitted any legal authority, that, generally speaking, in deciding fair market value, the legal rationale involved in using comparative sales of real estate are appropriately applied to such an approach to ascertain comparable rentals. The more comparable, however, the comparables relied upon are, the more probative they are of the fair market value of the subject property. See United States v. 8260 Acres of land,605 F.2d 762, 798 (5th Cir. 1989); 5 Nichols, op. cit. 21.3[1]. While comparability of rents may be quite helpful in determining fair market value, its most appropriate utility must consider all significant factors affecting comparability which include among others: location, character of the property, condition, the use to which the property is put, zoning, availability of utilities, size, proximity to the subject property. See e.g. Nichols, op cit. 21.3, 21,31; Campbell v. New Haven, 101 Conn. 173,125 A. 650 (1924). It is for the fact-finder to determine whether claimed comparables are in fact comparable, and if found comparable, to determine the weight to be accorded them. United States 84.4 Acres of Land etc, 238 F.2d 117, 119 (3d Cir. 1965); United States 67.59 Acres, 447 F. Sup. 844, 846, (M.D.Pa. 1978); see E. F. Realty v. Commissioner of Transportation, 173 Conn. 247
(1977).
The evidence, particularly Miner's report, contains information about each of the ten rentals claimed as comparables concerning the rental of the pizza parlor and the package store. The evidence yields no usable breakdown by him as to which of these, if this were so, were used to arrive at his rental CT Page 2891 figures for those two establishments in the "after". This is true although two of the ten refer to pizza locations (one a "pizza restaurant in Stonington and the other a "pizza/market" in New London) while a third refers to a "restaurant" in New London. There is only one package store among the remaining seven and that is in New London where the rent is set out as $11.87 per square foot. Of the ten properties used two are in Waterford, four are in New London, three are in East Lyme and one is in Stonington. It is part of the plaintiffs' task on this appeal to spell out, by a preponderance, which comparables are relied upon and why to assist in providing the "after" rental they claim as to the package store and the pizza parlor. The court realizes that expert opinion on this area is subjective, given the expertise of the appraiser, and should, though subjective, be based on facts and be articulated by the evidence. These offered comparables were not only not broken down between the two stores on the plaintiffs' property i.e. the pizza parlor and the package store, but, significantly, there is no adjustment articulated by the evidence as to significant factors of the comparables as set out above, as they play into the two stores on the subject property. Accordingly, the credible evidence does not preponderate to prove that, under the circumstances, Miner's opinion should stand as to the square footage figures in the "after" of $6.00 and $8.00 for the package store and pizza parlor respectively. The same observations may be applied to the comparables advanced to support the "After" rental for the apartment.
Going further, on the Miner's income approach, as to income the figures of $1597.00 and $1086.00 on the "before" and "after" for "Less Vacancy and Collection Loss", the court has no serious problem.
There are, however, problems with certain of the expenses in the "after" condition. He admitted that the insurance expense of $1329.00 he assigned in the "after" which was the same as in the "before" was in error. He said that he should have a different figure in the "after" for that test but never said what it should be.
There is also included in the "after" by Miner the figure of $27,100 as the "Redevelopment of site to comply with zoning." This includes a number of items including such things as correction of termite damage, paving and removal of old paving, grading and engineering. On cross examination Miner conceded that such costs are not operating costs and that it is not correct to add them into the income approach to estimate value of the plaintiffs' property. Such expenses, he said, were really a one-time expense that may be considered in estimating a cost to cure of this property. As to "cost to cure" any expense which is CT Page 2892 reasonably necessary to adapt the remaining land to use resulting from not only loss of parking but also due to loss of access to the property may enter into the consideration of the damages to be awarded. See Wakeman v. Commissioner of Transporation,177 Conn. 432, 435 (1979); Andrews v. Cox, 127 Conn. 455, 459-460
(1941). "The certainty or probability of future expenditures on the property rendered necessary or desirable by the changed conditions resulting from the completion of the public improvement, may affect the present value of the property after the improvement is completed, but they affect it only indirectly and are not in themselves recoverable items of damage." Gaylord v. Bridgeport, 90 Conn. 235, 240, 96 A. 936 (1916). As stated in Andrews v. Cox, supra., 460, "[t]he more accurate statement is, however, that such expenses are not recoverable as such but are evidence of elements in the decrease in market value, of which they may be an accurate measure." See also 27 Am.Jur.2d, Eminent Domain 314. Miner's use of the cost of repairs of $27,100. in the "after" as a reduction in operating income to get to his effective net income for damages computation purposes in the "after" is not a proper use of a "one-time" cost of repairs. The court agrees that such cost of repairs are not a year by year operating expense. As used by the plaintiff's expert it has the effect of increasing his ultimate opinion of compensable damages. Parenthetically, we discuss below what the plaintiffs ask be included in their claimed total compensable loss of $151,935.00 and which they denominate as "Additional cost to redevelop site to comply with Zoning." The latter category which is in addition to the their own expert's ultimate opinion of $117,000 should be increased, first according to the plaintiff, by approximately $50,000. as estimated by the plaintiffs' witness Samuel Turello (a general contractor) as well as then again using in their calculations the figure of $27,100 that Miner had already included in reaching his opinion of the value of $118,000.
Miner's evidence also points out that in the "after", the site would have to be redesigned to meet zoning requirements and that he had worked up a redesign of the site and gone over it with Martin, the Waterford Zoning Enforcement Officer, who, in turn, "confirmed that it looked like a proper design and appeared to meet all the requirements of zoning." While Martin did testify about Zoning requirements, the plaintiffs do not point out nor can the court find any evidence from Martin himself that he ever made any confirmation of the redesign as suggested.
Nevertheless, the effect of the taking which included the rights taken together with the location the lip curbing, denied the plaintiffs access to Route 1 from their property. This caused them to have to use Miner Road to access the property. In addition to Martin's evidence concerning loss of development and repairs the plaintiffs also produced Peter Turello, a general CT Page 2893 contractor from Groton whose ultimate cost estimate to do the site improvement work was $50,212.65 as of May 1988. This court had a serious problem with the credibility to be given Turello's cost estimate. When plaintiffs' counsel first asked Turello what he had in terms of work to be done and material charges there was an objection. The response from plaintiff's counsel was that Turello was going to testify to what Martin had earlier said "was required to construct a parking lot in the rear" and, in addition, that Commissioner's counsel had earlier objected to part of Miner's appraisal on the basis of hearsay and that "Mr. Turello is going to testify as to the cost of that work." After Turello testified further about work and material plaintiffs' counsel then asked him if he had an opinion whether or not "$27,100 would be a reasonable cost due to work you just described." This was a clear reference to the $27,100 figure used in the "after" analysis by Miner of the cost of the redevelopment of the site. An objection was made to that question and plaintiffs' counsel said that Turello would rephrase the question but he was thereafter asked if he had prepared a cost estimate and what it was. That latter question was answered but the $27,100 figure was not inquired of Turello any further. The only matter even tangentially related to that was an inquiry of Turello whether or not he knew "a Harry Mantsaris" to which he answered that he (Turello) was "not positive who he was." Turello's opinion that the prices included in the seventeen items in his estimate for labor — and materials in his May 16, 1988 estimate did not have "any substantial difference" from the prices for those at the time of the July 1986 taking did not seem credible. The claims for the acceptance of his 1988 estimate also includes the assertion that his estimate was a plan "attached" to his estimate. There was no plan attached to his estimate (Exhibit W) but he did say that he said that he was testifying from a paper just given him (Exhibit V). That paper, in turn, was said to be a copy of Exhibit 9 which was a site plan made by one Kent, a land surveyor in March 1988, which was submitted by the plaintiffs with their 1988 application for several variances some of which were granted and some denied. A close comparison of Exhibit V and Exhibit 9 indicates that the former appears to be a smaller copy of a portion of Exhibit V (it omits inter alia any legend identifying it and the surveyor's certification). However, Exhibit 9 shows nothing of such expenses as a front lawn and a fence which are in the Turello estimate. Moreover, the court is not satisfied that the dollars accredited by Turello to the estimates of the quantities and expenses of such items as gravel and blacktop which go into his opinion of the $50,212.65 cost are to be credited. Turello did not testify nor can it be fairly implied that the improvements he estimated at $50,212.65 would make the "improved" property fully in conformity with the required zoning. This presents a circumstance where his $50,216.65 estimate stands in rather CT Page 2894 strange comparison to Miner's earlier estimate of $27,100.00 for "redevelopment to comply with zoning."
Adding to the problematic nature of the evidence on this branch of the case we cannot overlook the evidence of the Commissioner's witness, Amerigo Scarpa. This witness was a consulting civil engineer of many years experience preparing cost estimates for commercial and residential construction and had worked on site designs for "probably several hundred residential subdivisions, a similar quantity of commercial sites, commercial sites." He had been at the subject property, had talked to Zoning Enforcement Officer David Martin and to Town Planning Director Wagner, reviewed certain plans, maps and zoning regulations and thereafter made a design that the Commissioner maintained would provide the requisite 23 parking spaces required in the rear of its plaintiffs' building. This design assumed that the plaintiffs' right of access to Route 1 had entirely been terminated. This plan admittedly was a "preliminary cost estimate"[15] and admittedly did not comply with all the zoning regulations. It was in the amount of $16,000. Despite these shortcomings of Scarpa's evidence, certain of his testimony provides helpful perspective in evaluating other evidence in this area. Plaintiffs' counsel asked Scarpa if it would be reasonable that 400 cubic yards of bank run gravel would be needed in carrying out this project. That was the figure Turello estimated would be needed. Scarpa's answer, which is credited, was "Absolutely not". He also indicated credibly that the elevation of the overall potential parking area in the rear did not need to be worked on as much as Turello indicated. In addition, Scarpa pointed out to the court that a portion of the area Turello would pave actually need not be paved at all.
Having concluded our discussion conceding the expenses of "improvements" we return to Miner's evidence. The plaintiffs' expert Miner reduced the estimated rental income in the "after" substantially and the court does not agree with that on the evidence. He reduced the package store by 33%, the pizza parlor by 38% and the apartment by 8%. As the Commissioner argues this reduced the effective gross income in the "after" about one third. These combined in turn to generate what the Commissioner claims to be $89,640 of Miner's total damage figure of $117,000.
On all the evidence the court, while finding that the plaintiffs are aggrieved, cannot credit Miner's reductions on the package store and the pizza parlor and the apartment but concludes that a reduction of 20% on the pizza parlor, 15% on the package store and 7% on the apartment is both justified and fair. Accordingly, the court concludes that just compensation in the amount of THIRTY-NINE THOUSAND FIVE HUNDRED DOLLARS, i.e. $39,500.00 is to be, and is awarded to the plaintiffs, plus CT Page 2895 interest on said $39,500.00 from July 17, 1986.
As already noted, the plaintiffs, in addition, to seeking compensation of $117,000. based on Miner's report, claim that "just compensation" should include certain additional costs and fees. We now take them up.
The plaintiffs here claim that "the additional cost to redevelop [the] site to comply with zoning" in the amount of $22,900. is to be added to the $117,000. They arrive at this figure of $22,900. by subtracting the figure of $27,100 which was the estimated cost to redevelop the site given by Miner from the approximately $50,000. cost of the improvements to the site testified to by their witness, the contractor Turello. The court has already discussed this evidence and indicated the credence it accords that, particularly Turello's evidence. The evidence of Miner and Turello here essentially overlap each other. Their evidence basically sounds in terms of "cost to cure" and is to be and has been considered as such on the ultimate question of value. See e.g. Wakeman v. Commissioner of Transportation, supra, 435-436 (1979). Mazzola v. Commissioner of Transportation,175 Conn. 576, 586 (1978). The court, however, cannot include the figure of $22,900 itself as part of the just compensation awarded not only because of such authority as Wakeman and Mazzola but also because of the credibility problems with Turello's evidence as well as Miner's use of the $27,100. to arrive at his "after" damage figures.
Next, the plaintiff seeks to have added the sum of $3,535.00 which they maintain are the legal fees and costs incurred by then in their 1988 application for variances made to the Waterford Planning and Zoning Commission referred to earlier. Some of the variances applied for were granted and some were not. The plaintiffs do not cite any authority in their brief for the allowance of this item as part of "just compensation". Apparently their theory is that this expense was incurred as a result of their efforts to get their remaining property in conformity to zoning where the taking brought about the circumstances that created their zoning difficulties.
Under our Constitution "the property of no person shall be taken for public use, without just compensation therefor." Conn. Const. Art. 1, 11. Although we cannot find Connecticut authority, we observe that the United States Supreme Court had said that "attorneys' fees and expenses are not embraced within just compensation" under theFifth Amendment to the United States Constitution. Dohany v. United States, 281 U.S. 362, 368 (1929); see also United States v. Bodcaw Co., 440 U.S. 202, 203 (1977). Bodcaw made clear that "as a result indirect costs to the property owner caused by the taking of his land are generally not CT Page 2896 part of the just compensation to which the owner is constitutionally entitled. Bodcaw v. United States, supra. What other expenses may be compensated for by "legislative grace" is, we submit, over and above the just compensation required by constitutional command. Nor is there any Connecticut statute which we find that demonstrates that it was intended that the plaintiffs in an eminent domain case be compensated for this expense. Even if plaintiffs' claim is that this attorney's fee bill came about as already opined, we believe that it still cannot be added in as a part of the just compensation due the plaintiffs. The court, therefore, will not add in the attorney's bill of $3,535.
Finally, the plaintiffs ask that these be added in as just compensation $4,500 for the written appraisal report of their expert Miner as well as $3,000 which they estimate is Miner's fee for "trial preparation and appearance, including trial preparation for hearing scheduled before the Honorable Charles House continued at the request of the Defendants — Testimony of Christopher Miner". It is suggested in their brief that this court can take the estimated $3,000. figure into consideration in making determination as to reasonable appraisal fees [and plaintiffs cite] Alemany v. Commissioner of Transportation, 215 Conn. 437, 449 (1990).
As to "appraisal fees" in highway condemnation cases the legislature has enacted a statute, General Statute 13a-76 and that statute is "the authority for a landowner's recovery of appraisal fees in highway condemnation cases." Alemany v. commissioner of Transportation, 215 Conn. 434, 449 (1990). This statute provides that, whenever the court determines that the commissioner's assessment was inadequate, as here, the court "shall award to such property owner such appraisal fees as [the court] determines to be reasonable." The matter of what constitutes a reasonable amount of appraisal fees is a question of fact for the trier. French v. Clinton, 215 Conn. 197, 205
(1990)
The Commissioner objected to the admission of Miner's bill for his written appraisal in the amount of $4500. He also moved that the appraisal itself be stricken for several reasons. The court has considered what amount should be reasonable for appraisal fees under the circumstances. Accordingly, it concludes that $4,500. is a fair figure to allow for appraisal fees in this case under 13a-76.
Judgment for the plaintiffs is entered in accordance with the foregoing.
ARTHUR H. HEALEY STATE TRIAL REFEREE CT Page 2897
FOOTNOTES